49 CCPA

**Application of Homer E. THORNHILL.**

**Patent Appeal No. 6815.**

United States Court of Customs and Patent Appeals.

July 11, 1962.

Browning, Simms, Hyer & Eickenroht, Ralph R. Browning, Houston, Tex. (Fred L. Witherspoon, Jr., Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 16 and 17 in application Ser. No. 593,636, filed June 25, 1956, entitled "Thread System." Claims 11, 13 and 15 were allowed by the board.

Appellant's invention is directed to a tapered threaded joint composed of male and female threaded members having the same tapers and the same thread standards so as to fit closely together. The primary object of this invention is "to provide a tapered thread system that can be made-up [1] without permanent damage

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

1. Members of a thread system are "made-up" when they are brought into interengagement. The expression "fully made-up" refers to the final interengagement of the thread system when power greater than hand power has been used in the make-up of the system.

to the thread system and that will seal effectively and repeatedly against high pressure." Appellant also emphasizes that the thread system of his invention is able to withstand great axial tension such as that encountered by threaded pipe joints in oil field drilling applications.

Appellant says prior art tapered thread systems are defective because the male member, during make-up, is continuously forced into an opening smaller than the male member, with the result that during make-up, the male member's resistance to further make-up increases and an end crushing and crimping stress is exerted on this member. Appellant's brief says:

"All this so distorts the angular contact between the members that they no longer mate and the effective sealing engagement becomes concentrated in one thread. The resulting concentration of stresses results in exceeding the elastic limit of the metal and ultimate high ratio of failures."

To remedy these defects, appellant's application says that in his invention

" * * * the male or externally threaded part is formed in the usual manner to any convenient standard. The female or internally threaded part is formed in the conventional manner to the same standard except that the thread length of the internal thread is shortened and space for the end of the male part to move into the female part beyond the internal thread without substantial contact with the wall of the female part beyond such threads is provided. The thread length of the internal thread should be such that the small diameter end of the male thread is substantially at or extends through the small diameter end of the female thread when the parts are in hand-tight relationship, that is, made-up with 50 ft. lbs. of torque.

"The provision of space at the small diameter end of the internal thread into which the male member may move without contact, may be provided by a groove in the internal wall of the female member. The groove should begin at the small diameter end of the internal thread and should be dimensioned axially and radially to receive the end of the male member as the thread system is rotated from hand-tight to fully made-up position."

Claim 16 is exemplary and reads (bracketed numbers added):

"16. A tapered thread system comprising, male and female members having external and internal mating threads respectively formed on substantially the same taper, [1] the thread of the male member being of such size and extent as to engage substantially all of the thread of the female member when the thread system is made up hand tight, [2] said female member having an internal annular groove at the small diameter end of the internal thread of a width and depth to receive the end of the male member as the members are rotated to full made up position, [3] the interengagement of the threads constituting the only limitation on the extent of make up."

Claim 17, though differently worded, calls for the same three requirements.

Claims 16 and 17, on appeal, stand rejected solely on the basis of being "structurally fully met"[2] by the following reference (referred to as "Crane"):

Crane's Catalog No. 52, "Crane Valves—Fittings, Pipe" page 367, 1936

The Crane reference page is headed "Normal Engagement Between Male and Female Threads to Make Tight Joints." Four thread systems are disclosed. Only one, labeled "Shoulder Type Drain-

2. These are the words of the examiner which the board affirmed.

age Fitting Threads," hereinafter referred to as the figure C embodiment, is relied on by the Patent Office. Reproduced here is an enlarged copy of the drawing of the Crane reference to which we have added identifying letters:

Crane's figure C embodiment

This figure, a half central section through a joint, discloses a female member X whose threaded length is about four and one-half threads. A male member Y, whose threaded length is approximately eight threads, is shown in engagement with all the female threads and extending therebeyond approximately two threads into an open space provided by an annular groove Z in the female half of the coupling. A radial shoulder at the axially inwardmost portion of the groove extends radially inwardly beyond the crest of the female threads.

The claims on appeal were first rejected by the examiner in his answer on appeal to the board for the reason that claims 16 and 17 were presented after final rejection to replace other claims. The examiner there discussed the Crane reference as follows:

"On page 367 of the Crane Catalog, the third figure from the left [C] illustrates 'Shoulder Type-Drainage Fitting Threads' wherein the extent of thread on the male member is greater than that in the female member. * * * the coupl-ing or female member is relieved adjacent the small diameter end of its thread at least as great as the diameter of its thread root at the said small diameter end. The relief recess also has a longitudinal dimension sufficient to allow full make up of the joint without engagement of the recess wall by the pipe end. The foot note * * * further provides a limitation on the thread size of the male thread by providing it [is] not to be threaded small and this limitation is obviously to provide full make up of the joint before the last thread of the male member reaches the female member."

In rejecting the appealed claims he said:

"Claims 16 and 17 are structurally fully met by the illustration in Crane. The functional limitations of complete thread engagement when the joint is made up hand tight appears [sic] to be shown in Crane."

Appellant objected to the examiner's characterization of the limitation he referred to as "functional" and the board disagreed with the examiner on that

point, saying it was a structural limitation. We shall so regard it.

Whether the rejection should stand clearly depends, since it is a "fully met" rejection, on whether what Crane discloses to one skilled in the art is structure corresponding to all the limitations of claim 16.

Starting with limitation [2] of the claim as above set forth, we note that Crane discloses a groove in the female member at the small diameter end of the threaded portion which receives the end of the male member. Appellant, however, criticizes the use of this portion of the Crane disclosure as a reference because "It is uncertain what degree of make up is illustrated in the fragmentary drawing shown in the third figure from the left in Crane except that it is 'tight'." This has reference to the heading on the page, which refers to "Tight Joints" and indicates that what the illustrations show is the "Normal Engagement" of such joints. We are not impressed with this argument because appellant, in his Reply Brief before the board, said:

"The Crane reference itself makes no allusion to hand tight position. There is no reason whatsoever to assume that the parts in the third figure from the left, on which the Examiner relies, are in hand tight position or *in anything other than fully made up position.*" [Emphasis ours.]

We shall proceed on the assumption that Crane shows a fully made up joint, and we make what seems to be a reasonable further assumption that when so made up the joint is as tight as it is intended to be for the service for which it was designed.

It is clear to us, on the basis of the foregoing, that limitation [2] of the claim is met by Crane.

As to limitation [3], we note that in the above illustration there is a remaining space between the male member and the shoulder of the female member which would not be closed until the male member has been turned about one complete revolution, so as to move inwardly by one thread. Appellant would have us believe that in Crane the male end is intended to strike the shoulder but this seems to us contrary to all indications. In the first place, if that were the way the joint was intended to be when "tight" we think it would have been so illustrated. In the second place, the reference contains an admonition against making the male thread "small to gauge." It seems a reasonable inference to draw from this that an undersize male member is to be avoided for the very reason that the male thread pipe end would then run in closer to the shoulder. Clearly, if the pipe struck the shoulder before full make up, it would be impossible to make a tight threaded joint. The whole tenor of the reference is that what it shows is tight *threaded* joints, not joints that are rendered tight or leakproof in any other way.

By reason of the foregoing considerations we also conclude that limitation [3] of the claim is met because we believe that as a practical matter the Crane joint is one in which the interengagement of the threads is the only limitation on the extent of make up.

Turning now to the Crane figure C disclosure and limitation [1], we see that as to the relative positions of the male and female members at hand tightness, Crane is absolutely silent.

The Patent Office has taken several positions with respect to the Crane figure C disclosure as a reference for limitation [1] of the claims. The examiner stated that it would "be obvious that most, if not all, of these [female] threads would be engaged in hand tight position." The board did not discuss directly the Crane disclosure but instead stated that:

"* * * these claims recite that 'substantially all' of the female or coupling threads be engaged. In our view, this claim language reasonably would permit somewhat less than complete thread engagement."

The solicitor seeks to clarify the Crane disclosure in the following manner: (1)

appellant has admitted that figure C cannot disclose a thread system in "any other than fully made up position" (2) appellant has further stated in his specification that "API specifications presently require that make-up of 2 inch up-set tubing from hand-tight to fully made-up position be two full turns. With this invention * * * two turns may be used," (3) accordingly, *if the male member of Crane's figure C embodiment is backed off two full turns, it will (a) be at hand tightness* and (b) engage "substantially all of the thread of the female member."

The error in this reasoning is that Crane's figure C embodiment is not directed to API threads. Crane states that this embodiment uses an American Standard Taper *Male* Thread, which is inserted in a *Crane* shoulder-type fitting. We are unable to equate appellant's statement concerning API standard threads to the eclectic Crane joint consisting, as it does, of American Standard Taper Male threads and whatever threads "Crane shoulder type Drainage Fittings" may have, absent a showing of equivalency.[3]

After a careful review of the entire record, we have been unable to find any means by which to explain the disclosure of the Crane figure C. We think that under such circumstances it would be futile for us to attempt to place in any particular relative position Crane's figure C male and female members at hand tightness. There clearly is no basis in this record for saying that "most, if not all" of Crane's female threads will be engaged by the male member at hand tightness.

Taking this view, we find it quite unnecessary to give much thought to the

degree of expansion, if any, imparted to the claims by the insertion of "substantially" as a modifier of the term "all." As we view Crane's figure C, it is entirely possible that a hand tight joint may exist when 75%, 50%, or even less of the female member's thread is engaged. Whatever meaning "substantially all" may have, it certainly does not comprehend such a large deviation from the whole.

In view of such considerations we are constrained to hold that hand tight engagement of the members disclosed in Crane's figure C *can not be determined from the disclosures of the reference.* The one clear thing about the Crane disclosure is that it is not clear, "at the exact point of novelty" of the claimed invention.

The decision of the board is reversed.

Reversed.

MARTIN, J., did not sit or participate because of illness

SMITH, Judge (concurring).

It is with reluctance that I concur in the result reached by the majority. I agree with the majority that the "hand tight engagement of the members disclosed in Crane's figure C *can not be determined from the disclosures of the reference.*" It is agreed that the disclosure clearly anticipates every other structural feature defined in the appealed claims and leaves open to doubt whether the differences between a "fully made up joint" and a "hand tight joint" in Crane's thread system is such that Crane's joint shown in figure C, when at hand tight position, would engage "substantially all the female threads." On this issue, I agree with the majority's

3. Even if we were to assume that *both* Crane members were machined to the American Standard for pipe threads, the record does not enable us to equate appellant's statements concerning API standard threads to anything meaningful in the Crane disclosure. Crane in fact teaches against such an equating when it states:

"Several Standards have been established covering pipe threads for various purposes. The oldest and probably most commonly used is the American Standard for Pipe Threads, known as A.S.A. Standard $B_2$–1919. There are also the American Petroleum Institute Standards No. $_5$A and $_5$L covering Oil Field Tubular Goods, such as Line Pipe and Casing Threads."

result only by resolving the doubt in favor of the applicant.

This doubt finds support in applicant's brief, where, in defining a "fully made joint" it is stated:

"A fully made up joint is one which is tightened by power to the degree customary in a given usage."

In the API thread system, described by applicant, this "given usage" in the oil well art where internal pressures may be high, requires considerable power to tighten the joint two turns beyond hand tight. In a usage where internal pressures are not high, such as in a drainage system using the Crane drainage fittings, it seems to be more than likely that fewer turns would be needed beyond the hand tight engagement of the threads to tighten the joint "to the degree customary" for the usage. It is noted also that applicant does not limit the appealed claims to an API thread system but, as stated in the specification, takes the position that it is applicable to all thread systems.

Doubt also has been created by the statement of the grounds of rejection. The examiner's answer clearly states the rejection of the appealed claims as "structurally fully met" by Crane. He also suggests, however, that it is obvious in view of the art. Thus the examiner stated in his answer:

"The affidavits have been carefully considered and appear to be drawn to the relative success of the joint which success the examiner does not deny. The evidence of the critical nature of the problem and the conclusion as to what caused the problem; i. e. failure of the end of the tube by compressive stresses has been also considered and *it is not seen where the solution is unobvious in view of the art.*" [Emphasis added.]

I am therefore also left in doubt as to the ground of rejection. Is it 35 U.S.C. § 102 as treated by the majority or does it also include an "obviousness" rejection under 35 U.S.C. § 103, as possibly suggested in the examiner's answer? Since the printed record here does not contain the other materials necessary to determine what the examiner may have intended in the above quoted portion of his answer, and since neither the solicitor nor the appellant have discussed this as a possible basis of rejection, the question of obviousness does not appear to be before us. This leaves me with no alternative but to also resolve this doubt in favor of appellant.